**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

SUEANN SWANEY, on behalf of plaintiff and the
class defined below,

       Plaintiff,

v.

REGIONS BANK,

       Defendant.

CIVIL ACTION
NO. 2:13-cv-00544-JHE

**REGIONS BANK'S MEMORANDUM OF LAW**
**IN SUPPORT REGIONS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

I. STATEMENT OF UNDISPUTED FACTS ...................................................................... 1

II. ARGUMENT AND CITATION OF LEGAL AUTHORITY ......................................... 7

    A. Summary Judgment Standard. .............................................................................. 7

    B. The Legislative Intent Behind the TCPA .............................................................. 8

    C. The Accused Regions Mobile Alert System Does Not Involve Use of an ATDS As Defined by the TCPA ........................................................................... 11

        1. The TCPA Narrowly Defines an ATDS. .................................................... 11

        2. Regions Does Not Send Texts Using an ATDS As Defined by the TCPA. ....................................................................................................... 13

    D. The FCC's Narrow Exception to the Definition of ATDS Does Not Apply to the Accused System. ....................................................................................... 14

        1. The FCC's Decision Applies Only to Predictive Dialers. ......................... 14

        2. The Accused System is Not a Predictive Dialer. ....................................... 16

    E. The Court Should Decline Plaintiff's Invitation to Expand the FCC's 2003 TCPA Order to Apply to Systems that are Not Predictive Dialers. ...................... 17

    F. Even Under Plaintiff's Definition, the Accused System is Not an ATDS ............ 21

III. CONCLUSION ............................................................................................................ 22

# I.    STATEMENT OF UNDISPUTED FACTS

1. Plaintiff has accused Regions Bank of violating the Telephone Consumer Protection Act ("TCA") by sending unauthorized text messages to Plaintiff's mobile device (Doc. 1).

2. Since January of 2011, Regions has offered its banking customers the ability to register to receive "mobile alerts" via text messages (Declaration of Kevin Wong ("Wong Dec") ¶2).

3. Mobile alerts are notifications sent via text message to bank customers' registered mobile devices containing up-to-date information about their bank accounts (Ex. A, p. 4).

4. Regions has contracted with service provider Monitise Americas, Inc. ("Monitise") to create and implement the Regions' mobile alert system (the "Accused System"). Per the parties' agreement, Monitise licenses its mobile alert software to Regions, and Regions was given the option to purchase the requisite hardware from Monitise or directly from an original equipment manufacturer (OEM) (Ex. B, ¶ 1.8).

5. Any Regions bank customer who has enrolled in Regions' "text banking" program or who has downloaded the Regions' iPhone mobile app onto their iOS mobile device is eligible to register to receive one or more "mobile alerts" (Ex. C).

6. Regions offers its bank customers the following "mobile alert" options: (a) a low balance alert, indicating the customer's account balance has dipped below a threshold chosen by the customer at the time of registration; (b) a deposit notification alert; (c) an overdraft fee alert, indicating that an overdraft fee has been incurred; (d) a check clearing alert, indicating that a check has cleared; (e) a zero balance alert, indicating a negative balance on a designated account; and (f) a Transaction alert, indicating that the customers' Regions debit card or CheckCard has been used (Ex. D).

7. In connection with registering for mobile alerts, Regions bank customers provide to Regions, among other information, the phone number(s) for the mobile device(s) on which they wish to receive the selected mobile alerts (Ex. D, p. 10).

8. Thereafter a "Verification Scheme" is triggered to verify that the user in question is in fact in possession of the device with the specified number (*id*.).

9. The registered phone numbers supplied by the Regions customers are stored along with other necessary information in a Regions database that is used in connection with the sending of mobile alerts (Ex. E, 39:4-41:2, 45:1-17).

10. Certain of the mobile alert options are "near real-time alerts" meaning that an alert is triggered at or near the time that the relevant event took place. Both the Transaction and Zero Balance alerts are near real-time alerts (Ex. D, p. 16-17).

11. Other alert options are "batch alerts," wherein alerts are not triggered until after a batch file containing the relevant events is processed by the mobile alert system. The low balance, deposit confirmation, check cleared and overdraft fee alerts are all batch alerts (*id*., p. 15-16).

12. Batch alerts are processed on a nightly basis (*id*., p. 25).

13. 

14.

15. When the Monitise server finds the signal file, the alert system receives and begins processing the batch file (Ex. D, p. 19).

16. To process the batch file, the system first ensures that the file has not already been processed (*Id.*; Ex. E, 54:12-19).

17. If the file has not been previously processed, the system determines if any of the accounts in the batch file are registered to receive account balance alerts and whether the balance indicated in the batch file meets the criteria (*e.g.* the customers' set balance threshold) for triggering an alert (Ex. D, p. 19; Ex. E, 55:1-11)

18. If the alert criteria are met, a message template for the alert type is applied (Ex. D, p. 19).

19. Thereafter, the Monitise server places the alert into a file which is then retrieved by an "aggregator" who then delivers the alert to the affected mobile device carrier (Ex. E, 56:6-10, 62:7-10; 75:9-13) It is the mobile device carrier, *e.g.* AT&T, who delivers the alert to the bank customer's registered mobile device (Ex. E, 56:6-10; Ex. D, p. 8; Wong Dec. ¶ 11).

20. The same process described above is also followed for the other three types of batch alerts, only the names of the batch event file and signal file differ as do the triggering events (Ex. D, p. 20-21).

21. The Accused System does not have the present capacity to dial the numbers stored in the database accessed by the system (Wong Dec. ¶11).

22. If a mobile alert recipient attempts to respond to a received mobile alert with a text message that contains no words recognized by the Accused System, the system will generate a response text providing a list of recognized commands, including the STOP

command which will deactivate the mobile device from the mobile alert program (Ex. F, p. 9.)

23. 

24.

25.

26.

27.

28.

29.

30. After receiving two additional alerts, Plaintiff responded with a text stating: "Who are u and what r u takeing [sic] about" (Ex. F, p. 8).

31. As none of the words in Plaintiff's text were recognized by the Accused System, the system responded with a text message containing a list of commands, including the "STOP" command to "deactivate alerts" (*id*.).

32. Instead of texting STOP, however, Plaintiff responded with a text stating "U need to call not tx," again triggering the system to respond with a list of commands, including the "STOP" command to "deactivate alerts" (*id*.).

33. This back and forth continued for the next several days until November 16, 2012, at which point Plaintiff responded with the text "Stop texting or i am going to call ATTORNEY!" (*Id*., p. 10).

34. Because Plaintiff's text contained the word "Stop," a command the system recognized, the Accused System responded with a confirmation that "You have cancelled and will receive no msgs . . . to turn alerts on again . . . [r]eply HELP for help" (*id*.).

35. Had Plaintiff taken no more action, she would have received no additional texts from the Accused System. Instead, however, Plaintiff responded with a text that stated "I hope so!! If I DO I WILL CALL ATTORNEY!!" (*Id*.).

36. Because Plaintiff's text did not contain any words recognized by the Accused System, the system once again responded with a text containing a list of commands, including the "STOP" command to "deactivate alerts" (*id*.).

37. On August 17, 2014, Plaintiff's counsel took a 30(b)(6) deposition of Monitise on the topic of whether the Accused System used an automatic telephone dialing system ("ATDS") as defined by the the Telephone Consumer Protection Act ("TCPA") to send mobile alerts to Plaintiff's mobile device. Monitise's Director of Web and Mobile Development, Kevin Wong, testified on behalf of Monitse (Ex. E).

38. At no point during the deposition did Plaintiff's counsel ask Mr. Wong whether the Accused System involved the use of equipment that has the capacity to store or produce telephone numbers to be called using a random or sequential number generator or to dial such numbers (Wong Dec ¶6).

39. At no point during the deposition did Mr. Wong testify that the Accused System used equipment that has the capacity to store or produce telephone numbers to be called using a random or sequential number generator or to dial such numbers (Wong Dec. ¶7).

40. Plaintiff has not come forward with any evidence indicating that any component in the Accused System is able to randomly or sequentially generate numbers to be dialed.

41. The Accused System does not have the capacity to randomly or sequentially generate numbers to be dialed (Ex. G, 9:16-24, 44:19-23). Rather, it would be impossible for the Accused System to randomly or sequentially generate numbers to be dialed (Wong Dec. ¶3).

42. The Accused System is only able to generate texts that are sent by a carrier to those cell phone numbers that have been provided to Regions by a Regions banking customer and thereafter entered into the database used by the Accused System (Wong Dec. ¶4).

43. During the 30(b)(6) deposition of Monitise, Plaintiff's counsel never asked Mr. Wong whether the Accused System used algorithms to automatically dial telephone numbers in a manner that "predicts" when the dialed party will answer the phone or a telemarketer will be available to take the call (Wong Dec. ¶8).

44. The Accused System does not have the ability to automatically dial telephone numbers in a manner that "predicts" when the dialed party will answer the phone or a telemarketer will be available to take the call (Wong Dec. ¶8).

45. Plaintiff's expert concedes that "[t]here is no predictive algorithm in the Defendant's system . . ." (Ex. H, ¶19; Ex. G., 105:10-12).

46. The Accused System is not capable of making telephone calls, as opposed to generating texts messages, nor are there any telemarketers that are involved with the systems' use (Wong Dec. ¶9).

## II.   ARGUMENT AND CITATION OF LEGAL AUTHORITY

To prevail on its claim under the TCPA, Plaintiff must establish that Regions sent text messages to Plaintiff without her consent using an "automated telephone dialing system" or "ATDS."   The text messages in this case all originated from the Accused System.   The dispute at hand concerns whether the Accused System satisfies the TCPA's definition of ATDS.   As shown herein, Plaintiff relies on an overly broad and misguided interpretation of the TCPA – an interpretation that has ***not*** been adopted in this jurisdiction – to conclude that the Accused System uses an ATDS to send text messages.   However, as set forth below, under the proper definition of ATDS – the one that is plainly set forth in the TCPA and which has been adopted by this Court – the Accused System is not an ATDS.   Moreover, as shown herein, even under Plaintiff's faulty definition, the Accused System is not an ATDS because there is no evidence in the record to show that the Accused System has the capacity to "dial numbers" as required under either parties' definition of ATDS.   For these reasons as set forth in greater detail below, this issue is ripe for summary adjudication.

### A.  Summary Judgment Standard.

The Federal Rules of Civil Procedure provide that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).   A dispute is "genuine" only if there is sufficient evidence for a reasonable fact-finder to find for the non-moving party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 42, 248-49 (1986).  Importantly, unsupported conjecture or conclusory statements cannot defeat summary judgment.  *Ellis v. England*, 432 F.3d 1321, 1327 (11th Cir. 20115).  Moreover, summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, (1986).

Here, Regions is entitled to summary judgment because Plaintiff has utterly failed to establish that the Accused System has the capacity to dial numbers at all much less to dial numbers stored or produced using a random or sequential number generator as required by the TCPA's definition of ATDS.

**B.  The Legislative Intent Behind the TCPA.**

The TCPA, 47 U.S.C. § 227, was enacted into law on December 20, 1991.  Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 (codified in scattered sections of 27 U.S.C.)  The purpose of the TCPA was to "protect residential telephone subscriber privacy rights by restricting certain commercial solicitation and advertising uses of the telephone and related telecommunications equipment." H.R. REP. No. 102-317, at 5-6 (1991).

The legislative history of the act makes clear that in enacting the TCPA, Congress was particularly concerned with protecting consumers from unsolicited telephone solicitations and advertisements made by telemarketers, especially when prerecorded messages were used.  *See, e.g.*, 137 Cong. Rec. S9840-0, S9874 (July 11, 1991) (the sponsor of the original House Bill noting that "the bill is purely targeted at those calls that are the source of the tremendous amount of consumer complaints at the FCC and at the States commissions around the country – the telemarketing calls placed to the home"); S.REP. 102-178 (noting the concern with "automatic dialer recorded message players (ADRMPs)" which "automatically dial a telephone number and

deliver to the called party an artificial or prerecorded voice message"); S. REP. No. 102-178, at 2 (1991) (suggesting that artificial or prerecorded messages are a greater nuisance and invasion of privacy than calls placed by "live" persons because they can fill an entire answering machine preventing others from leaving messages); H.R. REP. No. 101-633, at 2 (1990) ("The purpose of the bill . . . is to protect consumers by restricting the use of telecommunications equipment for specific, unsolicited advertising purposes."). In fact, it was specifically "[i]n response to these increasing consumer complaints" regarding use by telemarketers of prerecorded messages that "Senator Hollings introduced S. 1462, the "Automated Telephone Consumer Protection Act," the purpose of which was to "ban artificial or prerecorded messages to residential consumers and to emergency lines, and to place restrictions on unsolicited advertisements delivered via fax machines." S. REP. No. 102-178, at 3 (1991).

In passing the TCPA, Congress relied on several studies identifying "phone calls from a computer trying to sell something" as "annoying" by the greatest number of people surveyed. H.R. REP. 102-317, at 8-9 (1991). It expressed concern that automated calls using prerecorded solicitations were not only "intrusive," but "potentially dangerous" as well. Specifically, it noted that: "[o]nce a phone connection is made, automatic dialing systems can 'seize' a recipient's telephone line and not release it until the prerecorded message is played, even when the called party hangs up. This capability makes these systems not only intrusive, but in an emergency, potentially dangerous as well." *Id*. at 10. *See also* 137 Cong. Rec. S9840-02, S9874 (the original bill's sponsor noting that the bill's protections against use of automated calls to cell phones "are essential to ensure that the safety of lives and property are not put at risk by these machines," as they "often call and do not hang up the line. In some cases, the computer will ramble on for a full minute or longer after the person called hangs up. This can prevent the

person called from using the telephone at all, which is of special concern in emergency situations"); S. REP. No. 10-178, at 2 (1991) (noting that "automated calls fill the entire tape of an answering machine, preventing other calls from leaving messages" and "automated calls will not disconnect the line for a long time after the called party hangs up the phone, thereby preventing the called party from placing his or her own calls.").

The legislative history also establishes Congress' concern over the fact that "[t]elemarketers often program their systems to dial sequential blocks of numbers" including the numbers of "emergency and public service organizations" and "unlisted telephone numbers." H.R. REP. No. 102-317, at 10 (1991). This use of sequential dialing was found to be particularly problematic because it can tie "up all the lines of a business thereby preventing any outgoing calls." S.REP. No. 102-178, at 2 (1991). In a Senate Report submitted by Senator Hollings, under the heading "Why the Legislation is So Important," the Report notes among other things, the use of sequence dialing as a common consumer complaint regarding use of automated dialers.[1] See *Computerized Telephone Sales Calls and 900 Services* of the Comm. on Commerce, Science, and Transportation, S. Hrg. 102-918, at 68 (Oct. 10, 1991). And, the "Background and Need" Section of a Congressional Report accompanying the TCPA House bill indicates that a ban on automatic telephone dialing systems is necessary because such systems:

---

[1] Other noted complaints included:
- Telemarketers call the same number repeatedly
- Telemarketers call numbers reserved for emergency purposes
- Calls are placed during dinner hours
- The calling party does not identify himself
- Automated calls fill the entire tape of an answering machine
- Automated calls do not disconnected even after the called party hangs up
- Automated calls do not respond to voice commands to hang up even in an emergency
- Automated dialers dial numbers in sequence tying up all lines and preventing outgoing calls
- Calls to cell phones impose a cost to cellular users

S. Hrg. 102-918.

are programmed to dial ***sequential blocks of telephone numbers***, including those of emergency public organizations and unlisted subscribers. Since an [automatic telephone dialing system] can "seize" a recipient's telephone line once a phone connection is made and may not release the line when the recipient hangs up, they can result in an intrusive and potentially dangerous use of telecommunication equipment.

H.R. REP. No. 101-633, at 3 (1990) (emphasis added). Random number dialing was likewise cited as a particular concern. *See, e.g.*, *Telemarketing/Privacy Issues* of the Subcom. on Telecomm. and Finance, 102d Cong. 2 (1991) (Statement of Rep. Markey, Chairman noting that automatic dialing machines that "place calls randomly meaning they sometimes call unlisted numbers" cause "public safety problems"); S. REP. No. 102-178, at 2 (1991) (noting that "[h]aving an unlisted number does not prevent those telemarketers that call *numbers randomly or sequentially*") (emphasis added).

### C. The Accused System Does Not Involve Use of an ATDS As Defined by the TCPA.

#### 1. The TCPA Narrowly Defines an ATDS.

To address Congress's stated concerns, the TCPA places specific restrictions on the use of certain types of equipment in connection with the making of certain types of calls. Specifically relevant to this case, the TCPA prohibits use of an ATDS to make calls to any telephone number assigned to a "cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call."[2] 47 U.S.C. § 227(b)(1)(A)(iii)(2012). Consistent with Congress's concerns as expressed in the legislative history, the TCPA expressly defines an ATDS as "equipment which has the capacity":

> (A) to store or produce telephone numbers to be called, ***using a random or sequential number generator***; and

---

[2] A text message to a cell phone qualifies as a call within the meaning of the TCPA. *See, e.g., Gager v. Dell Fin. Servs., LLC*, 727 F.3d 2265, 2269 n. 2 (3d Cir. 20213).

(B) *to dial such numbers*.

47 U.S.C. § 227(a)(1) (emphasis added).  Even Plaintiff's counsel recently conceded that the

foregoing definition of ATDS is the only applicable definition in this case:

> Let's all be real clear.  There's one definition to what an ATDS is, and it's in the statute.  An ATDS means equipment which has the capacity to store or produce telephone numbers to be called *using a random or sequential number generator and to dial such numbers*. There's no dispute on -- I don't know what definition they're going to try to use, but this is the definition that we're going by.

(Doc. 52, p. 22, Transcript of December 18, 2014 Hearing (emphasis added)).

The TCPA's definition of ATDS leaves no doubt that not all automated dialing systems

qualify as an ATDS.  Rather, under the TCPA to be an ATDS, equipment *must* have the capacity

to store or produce numbers using a random or sequential number generator.  A "random"

number generator is equipment that produces "random sequences of 10 digits," whereas a

"sequential" number generator produces numbers in sequence, for example "(111) 111–1111,

(111) 111–1112, and so on."  *See, e.g.*, *Gragg v. Orange Cab Co.*, 995 F. Supp. 2d 1189, 1192

(W.D. Wash.  2014).  The statute is clear, however, that the equipment need only have the

"capacity" to store or produce numbers using a random or sequential number generator; it "need

not actually store, produce, or call randomly or sequentially generated telephone numbers'" for

liability to attach.  *Id.* at 2.  *See also, Hunt v. 21st Mort. Corp.*, Civil Action No. 2:12-CV-2697-

WMA, 2013 WL 5230061, at *3 (N.D. Ala. Sept. 17, 2013 N.D. Ala.) (the "statutory text plainly

focuses on 'the capacity' of equipment when defining an 'automatic telephone dialing

system' . . . .").  That said, "capacity" means "present capacity, at the time the calls were being

made," not potential capacity.  *Hunt*,  2013 WL 5230061, at *4.  Thus, while a defendant can be

liable under the TCPA for using a system that has such capacity "even if it does not make use of

the automatic dialing capability, it cannot be held liable if substantial modification or alteration

of the system would be required to achieve that capability." *Id.*

## 2. Regions Does Not Send Texts Using an ATDS As Defined by the TCPA.

Plaintiff has come forward with no evidence to show that the Accused System has the present capacity to store or produce telephone numbers to be called using a random or sequential number generator. *See, e.g., Dominquez v. Yahoo!*, 8 F. Supp. 3d 637, 641 n. 4 (E.D. Pa. 2014) (granting summary judgment to defendant because there was no evidence that the accused system had the present capacity to randomly or sequentially generate numbers"); *Gragg,* 995 F. Supp. 2d at 1193 (granting summary judgment to defendant because "Plaintiff has submitted no evidence that the [accused] program can autonomously randomly or sequentially generate numbers to be dialed as required to fulfill the statutory definition of an ATDS"); *Marks v. Crunch San Diego, LLC,* Case. No. 14-cv-00348, 2014 WL 5422976, at *3 (S.D. Cal. Oct. 23, 2014) (granting summary judgment to defendant because the plaintiff submitted no evidence that the accused platform has "the present capacity to store or produce numbers to be called, using a random or sequential number generator"); *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009) (reversing grant of summary judgment because of conflicting evidence over whether accused system has the capacity to randomly or sequentially generated telephone numbers).

Indeed, nowhere in the Rule 26(a)(2) report of Plaintiff's expert Jeffrey Hansen does Mr. Hansen opine or otherwise indicate that the Accused System has such capacity. To the contrary, Mr. Hansen readily concedes that the "***only thing*** to consider when determining whether or not this [Regions accused] system meets the definition of an ATDS" was whether "the system ***either*** stores ***or*** produces numbers" and "calls them automatically." (Ex. H, ¶23 (emphasis added)). He concluded that the Accused System meets the definition of ATDS not because it has the capacity to store or produce telephone numbers using a random or sequential number generator – which he concedes it does not – but solely because it "stores a list of cellular

telephone numbers in a database, and without any human intervention sends an SMS or text message" (*id.*, ¶ 24; Ex. G, 9:16-24; 10:8-17).

Because there is no evidence that the Accused System has the capacity to store or produce numbers to be called using a random or sequential generator such that it meets the statutory definition of ATDS, Regions is entitled to summary judgment that it has not violated the TCPA by using an ATDS to send unauthorized text messages to Plaintiff's mobile device.

### D. The FCC's Narrow Exception to the Definition of ATDS Does Not Apply to the Accused System.

#### 1. The FCC's Decision Applies Only to Predictive Dialers.

In concluding that the Accused System meets the definition of ATDS notwithstanding that it has no capacity to store or produce telephone numbers using a random or sequential number generator as required by the ATDS's plain language, Plaintiff relies on an FCC decision that has no bearing on or relevance to this case.

Specifically, in 2002, the FCC solicited comments regarding whether a particular type of equipment fell within the TCPA's definition of ATDS. In particular, the FCC requested comment on whether a "predictive dialer" is subject to the "ban on calls to emergency lines, health care facilities, paging services, and any service for which the called party is charged for the call," even when it "dials telephone numbers using a computer database of numbers." *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, CC Docket No. 92-90 (Sept. 18, 2002) (the "2002 TCPA Order"). The FCC was specifically seeking to determine whether it "should adopt rules to further restrict the use of predictive dialers to dial consumers' telephone numbers." 17 FCC Rcd. 17459, 17475 (Sept. 18, 2002).

Unlike other types of autodialing systems, a predictive dialer not only dials numbers automatically, but it includes "certain computer software" that "assists telemarketers in predicting when a sales agent will be available to take calls." *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, 18 FCC Rcd. 14014, 14091 (2003) (2003 TCPA Order). *See also,* 17 FCC Rcd. 17459, 17503 (Sept. 18, 2002) (noting that a predictive dialer is an "automated dialing system that uses a complex set of algorithms to automatically dial consumers' telephone number in a manner that 'predicts' the time when a consumer will answer the phone and a telemarketing will be available to take the call"); Ex. G, 39:10-16 (conceding that the ability to predict "when a sales agent would be available to take calls" is "the defining feature of a predictive dialer."). The FCC has recognized that the "principal feature of predictive dialing software is a timing function, not number storage or generation." 2003 TCPA Order, 18 FCC Rcd. at 14092. Predictive dialers "initiate phone calls while telemarketers are talking to other customers." *Id.* at 14022. In "most cases, telemarketers program the numbers to be called into the equipment, and the dialer calls them at rate to ensure that when a consumer answers the phone, a sales person is available to take the call." *Id.* at 14091. When a "consumer answers the telephone," a predictive dialer transfers the call to an available telemarketer. *Id.*

In addressing predictive dialers, the FCC expressed concern that such dialers in particular were becoming especially problematic because when they "simultaneously dial[] more numbers than the telemarketers can handle, some of the calls are disconnected." 17 FCC Rcd. 17459, 17475 (Sept. 18, 2002). Thus, the "consumer may hear silence on the line as the call is being transferred or a 'click' as the call is disconnected." *Id.* Indeed, the FCC noted that between

June 2000 and December 2001, it "received over 1,500 inquiries about predictive dialing alone." *Id.*

After receiving comments regarding predictive dialers, including comments indicating that "consumers are often frightened by dead-air and hang-up calls generated by predictive dialers believing they are being stalked," the FCC concluded that the "increase in the number of telemarketing calls over the last decade combined with the widespread use of such technologies as predictive dialers has encroached significantly on the privacy rights of consumers." 2003 TCPA Order, 18 FCC Rcd. at 14035. Accordingly, the FCC concluded that even when a predictive dialer dials numbers from a list and has no ability to dial them randomly or sequentially, "a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress." *Id.* at 14093. Importantly, in issuing this ruling, the FCC did not address any type of autodialing equipment other than predictive dialers and did not find that *any* program using a list of numbers is an ATDS.

### 2. The Accused System is Not a Predictive Dialer.

Even if this Court concludes that the FCC's 2003 TCPA Order is binding notwithstanding that it contradicts the plain language of the statute, there is no evidence to establish that the Accused System is an ATDS under the FCC's ruling. Specifically, there is no evidence to indicate that the Accused System is a "predictive dialer"; it does not use software or a "complex set of algorithms" that has the capability to "predict" when "a consumer will answer the phone" or when "a telemarketing will be available to take the call" nor is it able to "transfer" a call once answered to an available telemarketer. Even Plaintiff's expert, Jeffrey Hansen, readily concedes that the Accused System is not a predictive dialer (Ex. G, 105:10-12). Rather, the system is designed simply to prepare text alerts for delivery to phone numbers provided by registered bank customers either near the time of a specified event or on a nightly basis. The

system is not capable of taking into account the consumer's or any telemarketer's availability (Wong Dec. ¶10).

Because the Accused System does not have the capacity to randomly or sequentially dial telephone numbers and is not a predictive dialer, Regions is entitled to summary judgment that it does not use an ATDS to send text messages. *See Gragg v. Orange Cab Co.*, 995 F. Supp. 2d 1189, 1192 (W.D. Wash. 2014) ("Equipment is an ATDS if it either has 'the capacity to store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers' or is a predictive dialer with the capacity to dial telephone numbers from a list without human intervention") (citations omitted).

### E. The Court Should Decline Plaintiff's Invitation to Expand the FCC's 2003 TCPA Order to Apply to Systems that are Not Predictive Dialers.

Notwithstanding the narrow scope of the FCC's exception to the TCPA's definition of ATDS, Plaintiff is apparently under the misconception that ***any*** system that stores telephone numbers and dials those numbers without human intervention – whether it is a predictive dialer or not –constitutes an ATDS.   In so doing, Plaintiff appears to be relying upon decisions from a minority of district courts that cite to the FCC's narrow "predictive dialer" exception to completely ignore the statutory definition of ATDS. *See, e.g., Johnson v. Yahoo!*, Nos. 14 CV 20228, l4 CV 753, 2014 U.S. Dist. LEXIS 171325 (E.D. Ill. Dec. 11, 2014); *Legg v. Voice Media Grp., Inc.,* 20 F. Supp. 3d 1370, 1374-75 (S.D. Fla. 2014).  Specifically, these courts have erroneously concluded that the FCC's 2003 TCPA Order should apply "beyond the narrow circumstances of predictive dialers" to any system that stores numbers and dials those numbers without human intervention, even though on its face, the 2003 TCPA Order addresses only predictive dialers.  *Legg,* 20 F. Supp. 3d 1375.  *See also Johnson,* 2014 U.S. Dist. LEXIS 171325, at *9-10 (agreeing that "the FCC's interpretation on this point conflicts with the

statutory requirement that an ATDS have the capacity 'to store or produce telephone numbers to be called, *using a random or sequential number generator,'*" but nevertheless expanding the FCC's interpretation to include systems other than predictive dialers). *But see* 2003 TCPA Order, 18 FCC Rcd. at 14093 (concluding only that "a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress.").

This Court should reject Plaintiff's attempt to change the statutory definition of ATDS for three reasons. First, the majority of courts addressing the issue have rejected Plaintiff's approach and refused to apply the FCC's 2003 TCPA Order to equipment, other than predictive dialers, that lack random or sequentially dialing capability. *See e.g., Dominguez v. Yahoo!, Inc.*, 8 F. Supp. 3d 637, 643 n. 6 (E.D. Pa. 2014 (finding that the statutory definition of ATDS "require[s] more than simply that the system store telephone numbers and send messages to those numbers without human intervention"); *Gragg v. Orange Cab Co.*, 995 F. Supp. 2d 1189 (W.D. Wash. 2014) (finding that defendant's system was not an ATDS because it was not capable of randomly or sequentially generating numbers and was not a predictive dialer)); *Marks v. Crunch San Diego, LLC*, Case. No. 14-cv-00348, 2014 WL 5422976 (S.D. Cal. Oct. 23, 2014) (finding that defendant's system was not an ATDS because it was not capable of randomly or sequentially generating numbers and was not a predictive dialer).

Some of these Courts have gone so far as rejecting the FCC's decision in its entirety, even as it pertains to predictive dialers, concluding that the FCC "does not have the statutory authority to change the TCPA's definition of an ATDS." *See e.g.*, *Crunch San Diego,* 2014 WL 5429976, at *2 (holding that because the TCPA's definition of ATDS is "clear and ambiguous"

the "FCC's 2003 statutory interpretation of an ATDS is not binding on the Court" and that "any FCC attempt to modify the statutory language of §227(a) [defining ATDS] is impermissible").[3]

Second, while a few courts have agreed with Plaintiff's position, *this Court* has not. Specifically, in *Hunt v. 21st Mortgage Corp.*, Civil Action No. 2:12–CV–2697, 2013 WL 5230061, at *3 (N.D. Ala. Sept. 17, 2013), this Court specifically addressed "the statutory definition of an 'automatic telephone dialing system,'" and held that "to meet the TCPA definition of an 'automatic telephone dialing system,' a system ***must*** have a present capacity, at the time the calls were being made, to store or produce and call numbers ***from a number generator***." *Id.* at *4 (emphasis added). Thus, this Court has already addressed the issue and found, like the majority of courts have done, that to be an ATDS, equipment must use a (sequential or random) number generator. Because binding precedent excludes within the definition of ATDS equipment such as the Accused System that have no capacity to store or produce numbers using a random or sequential number generator and are not predictive dialers the Court should reject Plaintiff's argument.

Third, expanding the statutory language of the ATDS beyond its plain meaning and beyond the narrow exception provided by the FCC would undermine the "elementary principle of statutory interpretation that 'when the words of a statute are plain, there is no room for construction. If the language be clear it is conclusive.'" *Hodgson v. Mauldin*, 344 F. Supp. 302, 307 (N.D. Ala. 1972) (citing *Osaka Shosen Kaisha Line v. United States*, 300 U.S. 98, 101 (1937)). Indeed, in *Cable Alabama Corp. v. City of Huntsville*, 768 F. Supp. 1484 (N.D. Ala. 1991), this Court court cautioned that when considering the meaning of a statute, "[i]f the text of

---

[3] The *Crunch Fitness* Court also noted that even if the FCC interpretation "was binding or convincing, the FCC's interpretation deal with predictive dialers and not third-party text messaging platforms like the one at issue here." *Crunch San Diego,* 2014 WL 5422976, at *5 n. 5.

a statute leaves no room for doubt as to its meaning, the court has no authority to go further."  *Id.* at 1496.  The Court further noted that in "the absence of a 'clearly expressed legislative intention to the contrary,' the language of the statute itself 'must ordinarily be regarded as conclusive.'"  *Id.* (citations omitted).

Here the text of the TCPA leaves no doubt as to the definition of ATDS and its requirement that equipment have the capacity to store or produce numbers using a random or sequential number generator.  To the extent the Court finds itself bound by the FCC's 2003 TCPA Order, there is simply no basis for the Court to go beyond the specific "predictive dialer" issue addressed by that Order and apply the definition of ATDS to equipment other than predictive dialers.  Had the FCC intended its 2003 TCPA order to apply to *any* equipment that stores numbers and dials them without human intervention, it could and would have said so.  It did not.  Rather, it quite specifically limited its ruling to "predictive dialers." 2003 TCPA Order, 18 FCC Rcd. at 14093 ("Therefore, the Commission finds that a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress.").  Moreover, there is nothing in the "clearly expressed legislative intention" to indicate otherwise.   Indeed, if Congress wanted to define ATDS in the manner Plaintiff urges, it would not have included within the definition of ATDS the phrase "using a random or sequential number generator." 47 U.S.C. § 227(a)(1).  As another District Court recently held:

> [i]f the statute meant to only require that an ATDS include any list or database of numbers, it would simply define an ATDS as a system with 'the capacity to store or produce numbers to be called'; 'random or sequential number generator' would be rendered superfluous.  This phrase's inclusion requires it to have some limiting effect.

*Crunch San Diego,* 2014 WL 5422976, at *3.  In short, the words "random or sequential number generator" are clear on their face and should not be "read out of the statute" as Plaintiff would

have the Court do. *See id.* ("When a court construes a statute it should, if possible, do so as to prevent any clause sentence, or word, from being superfluous or insignificant.") *See also Cooper Indus., Inc. v. Aviall Servs. Inc.*, 543 U.S. 157, 166 (2004) (courts are "loathe" to render part of a statute superfluous).

Because the TCPA is clear on its face and in light of binding Northern District of Alabama case law, the Court should reject Plaintiff's attempt to expand the definition of ATDS in the proposed manner.

### F.  Even Under Plaintiff's Definition, the Accused System is Not an ATDS.

Even if the Court were to accept Plaintiff's assertion that the definition of ATDS covers *any* equipment that has the capacity to store numbers and dial them without human intervention, Regions is still entitled to summary judgment because there is no evidence in the record to establish that the Accused System has the ability to "dial" numbers.[4]  Indeed, the undisputed evidence shows just the opposite – that the Accused System does ***not*** have any capacity to dial the numbers stored in the Regions database.  Specifically, the undisputed evidence establishes that when a banking event, *e.g.*, an expenditure that causes a customer's balance to dip below a set threshold, triggers an alert, the alert is placed into a file and is retrieved by an  aggregator who then delivers the alerts to the appropriate carriers for delivery to the bank customers' mobile phones.  As Monitise's 30(b)(6) representative explained, once an alert is triggered, the alert "goes to the aggregator; the aggregator would then submit to the carrier; and the carrier would handle delivery to the enduser." (Ex. E, p. 61:25-62:10; 75:12-13 (the aggregator "mBlox connects to the carriers to send and receive SMS messages"); Ex. D, p. 8, 2.1 (document  titled

---

[4] Although Plaintiff's expert, Jeffrey A. Hansen, issued a 26(a)(2) report in which he referred to the Accused System as a "dialer," he cites to no record evidence that in any way establishes that the Accused System is capable of dialing numbers, and he ultimately concedes that when alerts are triggered by the Accused System, the "text messages are then sent to the wireless phone carriers through an aggregator." (Ex. H, p. 5).

"SMS 18 Messaging Architecture" states the "ClairMail appliance initiates a connection to the SMS aggregator to retrieve short messages from the queue and to deliver short messages to the wireless devices"); Ex. G, 74:20-75:1 (Plaintiff's expert acknowledging that text messages go "through an aggregator to the carrier to [the mobile owner's] phone."). At no time during this process does the Accused System "dial" any of the numbers stored in the database nor is there any evidence to indicate that it has the capacity to do so (Wong Dec., ¶ 11)

Because the ability to dial stored numbers is a required element for equipment to be an ATDS, and because Plaintiff has failed to come forward with any evidence to establish that the Accused System has the capacity to dial the stored numbers, Regions is entitled to summary judgment that the Accused System is not an ATDS.

### III. CONCLUSION

For the foregoing reasons, Regions respectfully requests summary judgment that it has not violated the TCPA because it has not sent any text messages using an ATDS.

Respectfully Submitted
Dated: February 9, 2015

By: /s/ *Robin L. McGrath*

Maibeth J. Porter (ASB-3915-O40M)
Joshua B. Baker (ASB-5105-S72B)
OF COUNSEL
Maynard, Cooper & Gale, P.C.
2400 Regions/Harbert Plaza
1901 6th Ave. North
Birmingham, Alabama 35203
Telephone:  1(205) 254-1000
Facsimile:   1(205) 254-1999

Robin L. McGrath, Ga. Bar No. 493115
(admitted *pro hac vice*)
Edward J. Benz, III, Ga. Bar No. 344010
(admitted *pro hac vice*)
Andrea J. Pearson, Ga. Bar No. 409604
(admitted *pro hac vice*)
PAUL HASTINGS LLP
1170 Peachtree Street, N.E.
Suite 100
Atlanta, GA  30309
Telephone:  1(404) 815-2400
Facsimile:    1(404) 815-2424

*Attorneys for Defendant*
*Regions Bank*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading has been served upon all counsel of record via the CM/ECF electronic filing system or via U.S. Mail on this the 9th day of February, 2015.

Michal S. Adkins (ASB-8639-I48A)
THE ADKINS FIRM, P.C.
The Kress Building
301 19th Street North, Suite 581
Birmingham, Alabama 35203
Telephone: 205-458-1202
Facsimile: 205-208-9632
Email: MicahAdkins@ItsYourCreditReport.com
*Attorneys for Plaintiff*

William Peerce Howard
Morgan & Morgan, Tampa P.A.
One Tampa City Center
201 N. Franklin St., 13th Floor
Tampa, Florida 33602
Telephone: 1(813) 223-5505
Facsimile:  1(813) 223-5402
*Attorney for Plaintiff*

Cathleen M. Combs
Edelman, Combs, Latturner & Goodwin, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
Telephone: 1(312) 739-4200
Facsimile:  1(312) 419-0379
*Attorney for Plaintiff*

      /s *Robin L. McGrath*
Robin L. McGrath