## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| SUEANNE SWANEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Number: 2:13-cv-00544-JHE |
| | ) | |
| REGIONS BANK, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Sueanne Swaney ("Swaney") initiated this action against Defendant Regions Bank ("Regions") alleging violations of the Telephone Consumer Protection Act of 1991 ("TCPA"), Pub. L. No. 102-243, 105 Stat. 2394 (codified in scattered sections of 27 U.S.C.), specifically 47 U.S.C. §227(b)(1)(A)(iii).[1]  (Docs. 1).  At the parties' request, the undersigned permitted limited discovery on, *inter alia*, whether Regions' system is an "Automatic Telephone Dialing System" and, upon completion, set a briefing schedule for dispositive motions on this issue.  (*See* doc. 27 & 51).    The parties have filed said motions, (docs. 59 & 62), which are fully briefed and ripe for review.   (Docs. 86, 90, 99, 100).   For the reasons stated below, the

---

[1] Shortly after initiating this action, Swaney moved for class certification pursuant to Federal Rule of Civil Procedure 23.  (Doc. 7).  At the time, Swaney also moved to continue briefing and disposition of the motion for class certification until relevant discovery could be completed.  (Doc. 8).  Finding good cause, the undersigned granted Swaney's motion to continue briefing and disposition of her class certification motion.  (Doc. 23).  The motion for class certification remains pending.

Additionally, the magistrate judge to whom this case was previously assigned stayed this action on June 7, 2013, awaiting decisions from the Eleventh Circuit on cases pending at the time that addressed the "called party" issue.  *See Osorio v. State Farm Bank, F.S.B.,* 746 F.3d 1242 (11th Cir. Mar. 28,2014); *Breslow v. Wells Fargo Bank, N.A.*, 755 F.3d 1265 (11th Cir. 2014). After several extensions of the stay, the undersigned lifted the stay on May 9, 2014.  (Doc. 27).

undersigned recommends Swaney's motion for partial summary judgment, (doc. 59), be **GRANTED**, and Regions' motion for summary judgment, (doc. 62), be **DENIED**.

## I. Standard of Review[2]

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 447 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial." *Id.* at 324. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*,

---

[2] The applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment. *See Gerling Global Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1233 (11th Cir. 2001). Indeed, the Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir.1984) (citation omitted).

283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence).   However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)).   Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Summary Judgment Facts

Swaney has accused Regions of violating the TCPA by sending unauthorized text messages to her mobile device.  (Doc. 1).  Since January 2011, Regions has offered its banking customers the ability to register to receive "mobile alerts" via text messages.  (Doc. 64-1 (Wong Declaration) at ¶ 2).[3]   Generally, mobile alerts are notifications sent via text message to a Regions customer's registered mobile device containing up-to-date information about his or her bank account.  (Doc. 64, Ex. A at 4).[4]

Regions has contracted with service provider Monitise Americas, Inc. ("Monitise") to create and implement the Regions' mobile alert system (the "Accused System").  (Doc. 64, Ex. B at ¶ 1.8).  Per the parties' agreement, Monitise licenses its mobile alert software to Regions, and Regions was given the option to purchase the requisite hardware from Monitise or directly from an original equipment manufacturer.  (*Id.*).

---

[3] Swaney's motion to strike the Wong declaration, (doc. 87) is **DENIED**.  There is nothing impermissible about submitting a declaration along with a deposition.  The declaration complies with Rule 56(c)(4), and Swaney points to nothing to support striking any portion of the declaration under the "Sham Affidavit" doctrine.  *See Van T. Junkins & Assoc. v. U.S. Indus.*, 736 F.3d 656 (11th Cir. 1984).

[4] Much of the evidence has been filed under seal because it contains either proprietary or personal information.

Any Regions bank customer who has enrolled in Regions' "text banking" program or who has downloaded the Regions' iPhone mobile app onto his or her iOS mobile device is eligible to register to receive one or more "mobile alerts."  (Doc. 64, Ex. C).  Regions offers its bank customers the following "mobile alert" options: (a) a low balance alert, indicating the customer's account balance has dipped below a threshold chosen by the customer at the time of registration; (b) a deposit notification alert; (c) an overdraft fee alert, indicating that an overdraft fee has been incurred; (d) a check clearing alert, indicating that a check has cleared; (e) a zero balance alert, indicating a negative balance on a designated account; and (f) a transaction alert, indicating that the customer's Regions debit card or CheckCard has been used.  (Doc. 64, Ex. D).

In connection with registering for mobile alerts, a Regions customer will provide Regions with, among other information, the phone number(s) for the mobile device(s) on which he or she wishes to receive the selected mobile alerts.  (Doc. 64, Ex. D at 10).  Thereafter, a "Verification Scheme" is triggered to verify that the user in question is in fact in possession of the device with the specified number.  (*Id.*).  The registered phone number supplied by the Regions customer is stored along with other necessary information in a Regions database that is used in connection with the sending of mobile alerts.  (Doc. 64, Ex. E at 39:4-41:2, 45:1-17).

There are two types of mobile alert options, "near real-time alerts" and "batch alerts." "Near real-time alerts" means an alert is triggered at or near the time that the relevant event takes place.  (Doc. 64-, Ex. D at 16-17).   Both the transaction and zero balance alerts are near real-time alerts.  (*Id.*). Other alert options are "batch alerts," wherein alerts are not triggered until after a batch file containing the relevant events is processed by the mobile alert system.  (*Id.* at 15-16).  The low balance, deposit confirmation, check cleared, and overdraft fee alerts are all batch alerts.  (*Id.*).  Batch alerts are processed on a nightly basis.  (*Id.* at 25).

For example, upon the triggering of a batch alert event, Regions delivers to a watch

directory a "batch event file."      (Doc. 64, Ex. D at 19; doc. 64, Ex. E at 54:3-7).   Upon

completion of the batch file, Regions sends a "signal file."  (Doc. 64, Ex. D at 19).   When

Montise finds the signal file, the alert system receives and begins processing the batch file.  (*Id.*).

To process the batch file, the system first ensures that the file has not already been processed.

(*Id.*; doc. 64, Ex. E at 54:12-19).   If the file has not been previously processed, the system

determines if any of the accounts in the batch file are registered to receive account balance alerts

and whether the balance indicated in the batch file meets the criteria (e.g., the customer's set

balance threshold) for triggering an alert.  (Doc. 64, Ex. D at 19; doc. 64, Ex. E at 55:1-11).   If

the alert criteria are met, a message template for the alert type is applied.  (Doc. 64, Ex. D at 19).

Thereafter, the Monitise server places the alert into a file which is then retrieved by an

"aggregator" (mBlox) who then delivers the alert to the affected mobile device carrier.  (Doc. 64,

Ex. E at 56:6-10, 62:7-10, 75:9-13).  It is the mobile device carrier, e.g., AT&T, who delivers the

alert to the bank customer's registered mobile device.  (Doc. 64, Ex. E at 56:6-10, doc. 64-5 at 8;

doc. 64-1 at ¶ 11).   The same process described above is also followed for all types of batch

alerts, only the names of the batch event file and signal file are different, as are the triggering

events.  (Doc. 64, Ex. D at 20-21).

        If a mobile alert recipient attempts to respond to a received mobile alert with a text

message that contains no words recognized by the Accused System, the system will generate a

response text providing a list of recognized commands, including the STOP command which will

deactivate the mobile device from the mobile alert program.  (Doc. 64-7 at 9, filed under seal).

        On April 9, 2012, a certain Regions customer (the "Customer") registered to receive

mobile alerts for "low balance," "deposit confirmation," and "transactions."  (Doc. 64, Ex. F at

14).   In connection with his enrollment, the Customer registered a certain mobile telephone

number (the "Mobile Telephone Number"), which was the number assigned to his mobile device

by his mobile device carrier Verizon.  (*Id.*).  As a result of the registration, the Mobile Telephone

Number was added to the Regions database.  (Doc. 64, Ex. E at 79:18-80:2).

On April 16, 2012, the Accused System triggered a low balance mobile alert, which was

sent by Verizon to the Customer's registered mobile device.  (*Id.*).  Over the next six months, a

number of additional alerts were sent to and received by the Customer's registered device.  (Doc.

64, Ex. F, at 1-7).  At some unknown point, the Customer canceled his phone service with

Verizon.  (Doc. 64, Ex. F at 14).  On November 5, 2012, Swaney's cell phone carrier, MetroPCS,

assigned the Mobile Telephone Number previously registered to the Customer to Swaney.  (*Id.*).

That same day, the Accused System triggered a low balance alert related to the Customer's

account, but Swaney received the alert on her device because that device was associated with the

Customer's previous cell phone number.  (Doc. 64, Ex. F at 1).

After receiving two additional alerts, Swaney responded with a text stating: "Who are u

and what r u takeing [sic] about."  (Doc. 64, Ex. F at 8).  As none of the words in Swaney's text

were recognized by the Accused System, the system responded with a text message containing a

list of commands, including the "STOP" command to "deactivate alerts."  (*Id.*).  Instead of

texting "STOP," Swaney responded with a text stating "U need to call not tx," again triggering

the system to respond with a list of commands, including the "STOP" command to "deactivate

alerts."  (*Id.*).  This back and forth continued for the next several days until November 16, 2012,

at which point Swaney responded with the text "Stop texting or I am going to call

ATTORNEY!"  (*Id.* at 10).  Because Swaney's text contained the word "Stop," a command the

system recognized, the Accused System responded with a confirmation that "You have canceled

and will receive no msgs . . . to turn alerts on again . . . .[r]eply HELP for help."  (*Id.*).  Had

Swaney taken no more action, she would have received no additional texts from the Accused

System.  Instead, Swaney responded with a text that stated "I hope so!! If I DO I WILL CALL

ATTORNEY!!"  (*Id.*).  Because this text did not contain any words recognized by the Accused System, the system once again responded with a text containing a list of commands, including the "STOP" command to "deactivate alerts."  (*Id.*).  At no time did Swaney authorize Regions to send automated calls (or texts) to her cellular device or furnish her cellular telephone number to Regions.  (Doc. 60, Ex. A at ¶¶ 9-10).

On August 17, 2014, Swaney's counsel took a Rule 30(b)(6) deposition of Monitise on the topic of whether the Accused System used an ATDS as defined by the TCPA to send mobile alerts to Swaney's mobile device.  Monitise's Director of Web and Mobile Development, Kevin Wong, testified on behalf of Monitise.  (Doc. 64, Ex. E).

According to Mr. Wong, as currently configured and implemented, the Accused System cannot randomly or sequentially generate numbers to be dialed.  (Doc. 64-1 at ¶3).  Instead, as currently configured and implemented, the Accused System is capable of generating text messages that can only be sent to those cell phone numbers that have been provided by a Regions banking customer and thereafter entered into the database accessed by the Accused System.  (*Id.* at ¶ 4).  There is no predictive algorithm in the Accused System.  (Doc. 64, Ex. G at 105:10-12, Ex. H at ¶19).[5]  The Accused System is not capable of making telephone calls per se, but is designed to generate text alerts (or text messages) and is not capable of taking into account the customer's or any telemarketer's availability.  (Doc. 64-1 at ¶¶ 9-10).

### III. Analysis

The TCPA provides that "[i]t shall be unlawful for any person . . . to make any call (other

---

[5] Because determining how the FCC has interpreted the TCPA is a question of law for the court to decide, it is not an appropriate subject for expert opinion.  *See Geter v. Galardi S. Enter., Inc.*, No. 14-21896-CIV, 2015 WL 2155721 (S.D. Fla. May 7, 2015) ("[W]hether Plaintiffs are independent contracts is a question of law and is not the proper subject of expert opinion."). Accordingly, Regions' motion to strike portions of Swaney's Rule 26(a)(2) report of Jeffery A. Hansen, (doc. 68), for the purposes of ruling on the motions for summary judgment is **GRANTED**.

than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system . . . to any telephone number assigned to a . . . cellular telephone service."  47 U.S.C. § 227(b)(1)(A)(iii).  Accordingly, a defendant violates § 227(b)(1)(A)(iii) of the TCPA only if it makes a call (or sends a text message) [6] using an ATDS. The single issue presented in the parties' motions is whether the Accused System is an ATDS.

> The TCPA states that the term ATDS "means equipment which has the capacity –
>
> (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and
>
> (B) to dial such numbers.

47 U.S.C. § 227(a)(1).  Regions contends Swaney has presented no evidence the Accused System has the present capacity to store or produce telephone numbers to be called using a random or sequential number generator, and, therefore, she cannot establish that the Accused System is an ATDS.  (*See* doc. 63 at 15-16).   In response, Swaney urges the Court to follow the guidance of a 2003 FCC Order to find that equipment can be an ATDS if it has the "capacity to dial numbers without human intervention," regardless of any showing that it has the present capacity to store or produce telephone numbers using a random or sequential number generator. (*See* doc. 59 at 7-11 & doc. 86 at 3-7).  Regions disagrees, arguing the 2003 FCC Order's conclusions regarding ATDS only apply to "predictive dialers," which are not implicated in this action.  (Doc. 63-16-19).  Like the parties, courts disagree on the definition of an ATDS.

Although the statutory text appears to require an ATDS be "equipment which has the capacity . . . to store or produce telephone numbers to be called, using a random or sequential number generator[,] and . . . to dial such numbers," 47 U.S.C. § 227(1)(1), in 2003, the FCC

---

[6] A text message to a cell phone qualifies as a call within the meaning of the TCPA.  *See In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Soundbite Comms., Inc.*, 27 FCC Rcd. 15391, at ¶2 (Nov. 29, 2012).

expanded that definition when it addressed the question of whether "predictive dialers" fell within the definition of ATDS. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, 18 FCC Rcd. 14014, at ¶129 (2003) ("2003 FCC Order").[7]  Predictive dialers are automated systems that call telephone numbers stored in pre-programmed lists or databases in a manner designed to maximize the efficiency of call centers. *See id.* at 14091.  The FCC determined that predictive dialers are within the definition of an ATDS, even though they may not "store or produce telephone numbers to be called, using a random or sequential number generator," as set forth in the text of the TCPA. *Id.*

Reviewing the statutory text and legislative history of the TCPA, the FCC noted that Congress enacted the TCPA to deal with the increasing use of automated systems to place large volumes of calls. *Id.* at 14091-92.  The FCC thus concluded that the defining characteristic of an ATDS is "the capacity to dial numbers without human intervention." *Id.* at 14092.  The FCC further reasoned that the TCPA's definition of an ATDS as a system with the capacity to generate numbers to be called "randomly or sequentially" reflected the state of automatic dialing technology at the time of the TCPA's passage, but that this requirement had become an anachronism given that the "teleservices industry has progressed to the point where using lists of numbers is far more cost effective" than generating numbers. *Id.* at 14092.  Though a predictive dialer might not fit squarely within the TCPA's statutory definition of an ATDS, the FCC found that it is the sort of automated equipment Congress intended to address through the TCPA because it has the "capacity to dial numbers without human intervention." *Id.* at 14092-93.  Accordingly, the FCC determined that a predictive dialer is an ATDS. *Id.*

---

[7] As discussed more fully *infra*, the Hobbs Act, 47 U.S.C. § 402, deprives district courts of jurisdiction to review the merit of FCC regulations relating to the TCPA. *See Mais v. Gulf Coast Collection Bureau, Inc.*, 786 F.3d 1110, 1119 (11th Cir. 2014).  Accordingly, when on point, this Court must follow the directives of the FCC as they relate to the TCPA.

Although this portion of the 2003 FCC Order only addresses ATDS in the context of predicative dialers, numerous courts have drawn upon the order for more than its narrow conclusion.  These courts focus on the FCC's reasoning that the defining characteristic of an ATDS is the "capacity to dial numbers without human intervention," and have found equipment to qualify as an ATDS if it could dial numbers without human intervention, for example by calling or sending text messages to numbers in a preprogrammed list, irrespective of the presence of a random or sequential number generator.  *See e.g., Legg v. Voice Media Group, Inc.*, 20 F. Supp. 3d 1370, 1375 (S.D. Fla. 2014); *Lardner v. Diversified Consultants, Inc.*, 17 F. Supp. 3d 1215, 1222 (S.D. Fla. 2014) (following the 2003 FCC Order to hold that "systems that automatically dial cell phone numbers from a preprogrammed list, including the specific LiveVox software at issue in this action, are 'automatic telephone dialing systems' under the TCPA"); *Fields v. Mobile Messengers America, Inc.*, No. C 12-05160, 2013 WL 6774076, *2-3 (N.D. Cal. Dec. 23, 2012) (citing the 2003 FCC Order and finding that evidence of text messages sent without human intervention was sufficient to preclude summary judgment on whether an ATDS was used).  Other courts, however, have declined to apply the 2003 FCC Order outside of the context of predictive dialers.  *See e.g., Dominguez v. Yahoo!, Inc.*, 8 F. Supp. 3d 637, 643 n.6 (E.D. Pa. 2014) (rejecting the FCC's guidance and finding that the definition of ATDS "require[s] more than simply that the system store telephone numbers and send messages to those numbers without human intervention" and stating "this [FCC Order] pertains to the unique characteristics of predictive dialers, and there is no contention here that Yahoo's Email SMS Service is a predictive dialer").

The cases Regions cites in support of its position are either distinguishable, unpersuasive, or both.  First, *Marks v. Crunch San Diego, LLC*, No. 14-cv-00348, 2014 WL 5422976 (S.D. Cal. Oct. 23, 2014), is not persuasive.  In that case, the court rejected the FCC's interpretation of

an ATDS, relying on the Ninth Circuit's finding that the statutory language is "clear and unambiguous." *Id.* at *2 (citing *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009).  The district court then found that, despite the FCC's orders, the TCPA requires an ATDS to have the present or potential capacity to randomly generate telephone numbers.  *Id.* at *3-4.  This rationale is unpersuasive.  The Eleventh Circuit recently clarified that the Hobbs Act, 47 U.S.C. § 402, deprives district courts of jurisdiction to review the merit of FCC regulations relating to the TCPA.  *See Mais v. Gulf Coast Collection Bureau, Inc.*, 786 F.3d 1110, 1119 (11th Cir. 2014).  Because the California district court in *Marks* applied the "clear and unambiguous" *Chevron* deference standard to interpret the TCPA instead of following the 2003 FCC Order, it is not consistent with Eleventh Circuit precedent.  Accordingly, *Marks* is not applicable here.  Additionally, the court in *Dominguez v. Yahoo!, Inc.*, 8 F. Supp. 3d 637, 643 n.6 (E.D. Pa. 2014), relied on *Chevron* in declaring that the court's inquiry ended with the "clear and unambiguous" language of the TCPA.

The Washington district court's decision in *Gragg v. Orange Cab Co.*, 995 F. Supp. 2d 1189 (W.D. Wash 2014), is also not persuasive.  Although the district court in *Gragg* did not apply the 2003 FCC Order outside of the context of a predictive dialer, it based its conclusion that the equipment at issue was not an ATDS because it found there was a certain level of human agency involved in transmitting the text notifications at issue.  *Gragg*, 995 F. Supp. 2d at 1193-94.  The facts in *Gragg* are distinguishable.

Finally, the sole case from this Court, *Hunt v. 21st Century Mortgage Corp.*, No. 1:12-cv-2697-WMA, 2013 WL 5230061 (N.D. Ala. Sept. 17, 2013), is distinguishable.  Not only does *Hunt* address a discovery motion as opposed to a motion for summary judgment, it neither mentions nor discusses the application of the 2003 FCC Order.  *See id.*.  The undersigned is not inclined to read more into the *Hunt* opinion than is there.

To the extent confusion remains as to the reach of the 2003 FCC Order, as recently as November 2012, the FCC cited its 2003 Order and explained as follows:

> The Commission has emphasized that this definition [of an ATDS] covers any equipment that has the specified *capacity* to generate numbers and dial them without human intervention regardless of whether the numbers called are randomly or sequentially generated *or come from calling lists*. *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, 18 FCC Rcd. 14014, 14092, ¶ 133 (2003). The Commission has, for example, concluded that the scope of that definition encompasses "hardware [that], when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, *or from a database of numbers*," in light of, among other things, its conclusion that "the purpose of the requirement that equipment have the 'capacity to store or produce telephone numbers to be called' is to ensure that the prohibition on autodialers is not circumvented." *Id.* at 14091-93, ¶¶ 131, 133.

*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, 27 FCC Rcd. 15391, 15392 n.5 (Nov. 29, 2012) ("2012 FCC Order") (emphasis added). This language recognizes that an ATDS may have the specified capacity to generate numbers and dial them without human intervention, but that it may do so whether the numbers are randomly or sequentially generated *or* if they come from a calling list or from a data base of numbers. To the extent Regions argues Swaney must present some evidence that the Accused System has the present *capacity* to generate numbers using a random or sequential number generator, the 2003 FCC Order explicitly noted that "[s]ome dialers are capable of being programmed for sequential or random dialing; some are not." FCC Order at 14090 n.432. By all appearances, the FCC is no longer concerned with whether equipment has the capacity to be programmed for sequential or random dialing when determining if it is an ATDS.

Without direct guidance from the Eleventh Circuit, the undersigned is persuaded that the 2003 FCC Order applies beyond the narrow circumstances of predictive dialers. In the 2003 FCC Order, the FCC clearly expressed that an ATDS is defined by "the capacity to dial numbers

without human intervention," for example, by calling numbers in a database as in this case.  *See* 2003 FCC Order, at 14091-93.  The FCC's reasoning in concluding that a predictive dialer may qualify as an ATDS under those criteria is relevant beyond the narrow circumstances of predictive dialers.  In the 2003 FCC Order, the FCC noted that, although the state of technology has evolved beyond the necessity of dialing random or sequential numbers, the basic function of the equipment – the *capacity* to dial numbers without human intervention – has not changed.  *Id.* at 14092.  Therefore, the FCC concluded that the statutory requirement the equipment have the "capacity to store or produce telephone numbers to be called" was included to ensure that the prohibition on autodialing not be circumvented.  *Id.* at 14094.  These concerns reach beyond the use of predictive dialers and thus it is reasonable to interpret the 2003 FCC Order as applying beyond the context of predictive dialers.

Swaney presents sufficient evidence to demonstrate the Accused System has the capacity to dial numbers[8] without human intervention.  Under the FCC's interpretation of the relevant TCPA provisions, this is all that is required.  Swaney is entitled to partial summary judgment on this issue of whether the Accused System is an ATDS under the TCPA.

## IV. Recommendation

Based on the foregoing, the undersigned **RECOMMENDS** Swaney's motion for partial

---

[8]  Regions argues the Accused System is not an ATDS because there is no evidence that it has the ability to "dial" numbers.  (Doc. 63 at 23).  Specifically, Regions explains that when a banking event triggers an alert, the alert is placed into a file and is retrieved by an aggregator (mBlox) who delivers the alerts to the appropriate carriers for delivery to the customers' mobile phones.  (*Id.*; doc. 64, Ex. E at 61:25-62:10; 75:12-13, Ex. D at 8, 2.1, Ex. G. 74:20-75:1).   It is well-settled that the term "call" "'encompasses both voice calls and text calls to wireless numbers including, for example, short message service (SMS) calls,' i.e., text messages."  *Pinkard v. Wal-Mart Stores, Inc.*, No. 3:12-cv-2902, 2012 WL 5511039, at *3 (N.D. Ala. Nov. 9, 2012) (quoting 2003 FCC Order at 14115, ¶ 165).  The evidence demonstrates that the Accused System is capable of sending a message to a list of numbers without human intervention.  This qualifies as placing a "call."  The Accused System clearly causes a text message to be sent.

summary judgment, (doc. 59), be **GRANTED**, and Regions' motion for summary judgment, (doc. 62), be **DENIED**.

Should this recommendation be accepted, the undersigned **FURTHER RECOMMENDS** this action be referred back to him, at which time a scheduling conference will be set.

### V. Notice of Right to Object

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b)(2), Fed. R. Civ. P., any party may file specific written objections to this report and recommendation within fourteen (14) days from the date it is filed in the office of the Clerk.  Failure to file written objections to the proposed findings and recommendations contained in this report and recommendation within fourteen (14) days from the date it is filed shall bar an aggrieved party from attacking the factual findings on appeal.  Written objections shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection.  A copy of the objections must be served upon all other parties to the action.

DONE this 13th day of July 2015.


_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE